PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KENDALL J. MATTHEWS, a/k/a
Kendall Matthews,

*Defendant-Appellant.*

No. 09-4005

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, Chief District Judge.
(3:08-cr-00289-JRS-1)

Argued: October 28, 2009

Decided: December 31, 2009

Before TRAXLER, Chief Judge, and DUNCAN and AGEE,
Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Chief Judge Traxler and Judge Agee joined.

## COUNSEL

**ARGUED**: James Orlando Broccoletti, ZOBY & BROCCO-
LETTI, Norfolk, Virginia, for Appellant. Peter Sinclair Duf-
fey, OFFICE OF THE UNITED STATES ATTORNEY,

Richmond, Virginia, for Appellee. **ON BRIEF:** Dana J. Boente, Acting United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

DUNCAN, Circuit Judge:

This is an appeal from a conviction and sentencing for conspiracy to distribute marijuana in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine hydrochloride in violation of 21 U.S.C. § 841, and possession of a firearm by an unlawful user of controlled substances in violation of 18 U.S.C. § 922(g)(3). Appellant Kendall Matthews argues that the district court erred in denying his motion to suppress evidence obtained from an inventory search of his vehicle. For the reasons that follow, we affirm.

I.

On September 24, 2007, Deputy Robert Clark of the Sussex County Sherriff's Department (the "Department") was driving westbound on Route 460 when he observed a vehicle with a tinted cover over its front license plate driving eastbound toward him.[1] As the vehicle drew closer, Deputy Clark recognized Matthews as the driver. Deputy Clark had encountered Matthews once before and recalled an outstanding warrant for his arrest.[2] After verifying the warrant, Deputy Clark stopped Matthews and placed him under arrest.

---

[1]The cover over the license plate presumably constituted a traffic violation pursuant to Va. Code Ann. § 46.2-716.

[2]The parties stipulated to the following facts below. On April 23, 2007, Clark responded to a call of a possible breaking and entering at Matthews's home. During his protective sweep of the home, Clark observed marijuana in plain view. A search of the residence was conducted, pursuant to a lawful search warrant, and several items were seized, including

The other passengers in Matthews's car were Cashmere Wilson, a seventeen-year-old girl with an out-of-state learner's permit, and an infant. Because neither could drive the car away and because the car was parked on private property, Deputy Clark impounded the vehicle. Meanwhile, Wilson called her sister, Matthews's girlfriend, informed her of the situation, and asked to be picked up.[3]

The Department had a policy that required officers to inventory an impounded vehicle's contents. The policy stated:

> POLICY: The purpose of this policy and procedure is to establish a uniform method for taking inventories of impounded or confiscated vehicles. This will include any vehicles seized by this department or by other departments and turned over to this department.

> PROCEDURE: A complete inventory will be taken on all impounded or confiscated vehicles including the interior, glove compartment and trunk. All valuables located in the interior or glove compartment will be locked in the trunk of the vehicle or otherwise secured to prevent any loss or theft. The inventory form will be made in triplicate. One copy will

approximately one-half ounce of marijuana, packaging devices, over $40,000 in United States currency, and two firearms. Although Matthews was advised of his *Miranda* rights, he agreed to waive those rights and speak to law enforcement. He admitted that he had been dealing marijuana, and that the large amount of currency recovered was related to his drug dealing activities. He also admitted to being a regular user of marijuana while in possession of the firearms.

[3]As the district court noted, it is not clear whether Matthews's girlfriend was coming to pick up only the juvenile passenger and the infant or the passenger, infant, and car. Regardless, after she arrived at the scene, Deputy Clark ran her information and determined that her Maryland license was suspended and that she was therefore not qualified to drive the car.

be attached to the confiscated form, a copy turned in to the secretary to be placed on file and a copy retained by the officer performing the inventory.

J.A. 28. In accordance with that policy, Deputy Clark searched the interior, glove compartment, and trunk of Matthews's car.

Sorting through the interior first, Deputy Clark discovered a purse, which he gave to Wilson. He then searched the vehicle's trunk. In it, Deputy Clark found a small blue backpack, a small black clothing bag, a larger black clothing bag, a blue suitcase, and three plastic shopping bags. Wilson claimed ownership of the blue backpack, two of the plastic shopping bags, and the smaller black bag. Deputy Clark surrendered those items to her custody, and then continued his inventory of the remaining items. Inside the larger black bag, he discovered a FedEx package addressed to Matthews and a boot. Inside the boot was a purple velvet bag with a jar of marijuana inside. In the blue suitcase, Deputy Clark found fourteen brick-sized packages resembling processed or packaged cocaine. All inventoried items were photographed, recorded in a report, and then seized as evidence. After concluding the inventory, Deputy Clark called for a tow truck.[4]

On June 16, 2008, Matthews was indicted in the United States District Court for the Eastern District of Virginia, and charged with possession with intent to distribute a mixture and substance containing detectable amounts of cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii) (Count 1); conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846 (Count 2); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 3); and possession of a firearm

---

[4]It took Deputy Clark forty minutes from the time of the arrest to call the tow truck. Deputy Clark testified that this wait is typical in Sussex County. Matthews does not contest this.

by an unlawful user of controlled substances, in violation of 18 U.S.C. § 922(g)(3) (Count 4).

On June 25, 2008, Matthews entered a plea of not guilty. Thereafter, Matthews filed two motions to suppress evidence. One motion concerned the search of his home on April 23, 2007,[5] and the other concerned the inventory search of his vehicle on September 24, 2007. The district court denied both motions at a hearing held on September 23, 2008. That same day, pursuant to a plea agreement, Matthews pleaded guilty to Counts 1, 2 and 4, and reserved the right to appeal the district court's ruling on his motion to suppress the evidence obtained through the inventory search of his vehicle.[6]

On December 18, 2008, the district court sentenced Matthews to 121 months of imprisonment with credit for time served on Count 1; 60 months of imprisonment on Count 2; and 120 months imprisonment on Count 4. All sentences were ordered to be served concurrently. The next day, Matthews filed this appeal.

## II.

On appeal, Matthews challenges the denial of his motion to suppress the evidence obtained through Deputy Clark's search of his bags. In examining a district court's ruling on a motion to suppress, "[w]e review the district court's factual findings for clear error and its legal determinations de novo." *United States v. Jarrett*, 338 F.3d 339, 343-44 (4th Cir. 2003). We view the facts in the light most favorable to the prevailing party below. *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003).

---

[5]Because Matthews does not contest the district court's ruling on this motion, the events leading up to and concerning the April 23, 2007, search are only briefly addressed in footnote 2 above.

[6]The government agreed to dismiss Count 3.

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *see also United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006). A warrantless search may nevertheless be valid, and the evidence obtained from that search may be admissible, if the search "'falls within one of the narrow and well-delineated exceptions' to the Fourth Amendment's warrant requirement." *Currence*, 446 F.3d at 556 (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999)). One such exception, applicable here, is the inventory search exception. *United States v. Banks*, 482 F.3d 733, 738-39 (4th Cir. 2007) (citing *South Dakota v. Opperman*, 428 U.S. 364, 374-76 (1976)).

Police officers frequently perform inventory searches when they impound vehicles or detain suspects. *See, e.g.*, *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) (holding admissible evidence recovered during an inventory search of a shoulder bag possessed by a lawfully arrested person); *Opperman*, 428 U.S. at 376 (holding admissible evidence discovered during the impoundment of an illegally parked automobile). Such searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *see also Banks*, 482 F.3d at 739 ("A proper inventory search is merely an incidental administrative step following arrest and preceding incarceration, conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing.") (internal quotation marks and citations omitted).

For the inventory search exception to apply, the search must have "be[en] conducted according to standardized criteria," such as a uniform police department policy, *Bertine*, 479 U.S. at 374 n.6, and performed in good faith, *Banks*, 482 F.3d at 739; *see also United States v. Brown*, 787 F.3d 929,

932 (4th Cir. 1986). Because Matthews does not argue that Deputy Clark administered the Department's policy in bad faith, our analysis focuses only on whether the search was conducted pursuant to standardized criteria.[7] "The existence of . . . a [standardized criteria] may be proven by reference to either written rules and regulations or testimony regarding standard practices." *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (internal citations omitted). To justify a warrantless search, standardized criteria must sufficiently limit a searching officer's discretion to prevent his search from becoming "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

In denying Matthews's motion to suppress, the district court found Deputy Clark's search of Matthews's bags consti-

---

[7]Even if the bad-faith argument had not been abandoned at oral argument, we would reject it because the record does not support such an allegation. While Matthews suggests that the inventory search was nothing more than a pretext for gathering evidence against him, he points to no evidence in support of this claim, aside from the fact that Deputy Clark had searched his home once before and knew there was an outstanding warrant for his arrest. These allegations, however, are not sufficient, since "[a]n officer's suspicion that contraband may be present [in the vehicle] does not invalidate an otherwise lawful inventory search." *United States v. Cox*, No. 90-5853, 1992 WL 29136, at *3 (4th Cir. Feb. 20, 1992); *see also United States v. Lewis*, 3 F.3d 252, 254 (8th Cir. 1993); *United States v. Cecala*, No. 99-4049, 2000 WL 18948, at *2 (10th Cir. Jan. 12, 2000).

In addition, the facts in this case support the conclusion that the inventory search was performed in good faith. After placing Matthews under arrest, Deputy Clark reasoned that the car would need to be towed because it was on private property and there "was no other driver at that time to take the vehicle away." J.A. 79. Only after making such a determination did Deputy Clark begin the inventory search of the vehicle, and he performed this search because the "department policy at the time stated that [he] had to take full inventory of the vehicle." J.A. 80. Under these circumstances, it is entirely reasonable for an officer to perform an inventory search, *see, e.g.*, *United States v. Hartje*, 251 F.3d 771, 776 (8th Cir. 2001), and Matthews has presented no evidence to either contradict or impeach Deputy Clark's testimony.

tutional. The court said the search fell within the inventory search exception because Deputy Clark had conducted it in accordance with the Department's policy for the inventory of impounded or confiscated vehicles. Matthews argues the district court's reasoning is erroneous for two reasons. We address each contention below.

### A.

First, Matthews argues that Deputy Clark could not have followed standardized criteria because the Department's policy does not specify how an officer should handle closed containers. He contends that absent such directive, Deputy Clark's search of his vehicle was not sufficiently regulated to satisfy the requirements of the Fourth Amendment. We disagree.

A police department's policy on inventory searches does not have to specifically use the phrase "closed containers" to permit the search and seizure of such items.[8] *See, e.g.*, *United States v. Richardson*, 121 F.3d 1051, 1055-56 (7th Cir. 1997); *Thompson*, 29 F.3d at 66; *United States v. Wilson*, 938 F.2d 785, 789-90 (7th Cir. 1991).[9] In *Thompson*, for example, the

---

[8]Matthews contends that *United States v. Salmon*, 944 F.2d 1106, 1120-21 (3rd Cir. 1991) and *United States v. Hahn*, 922 F.2d 243, 247 (5th Cir. 1991) held that a police department's policy must explicitly explain how closed containers should be handled to satisfy the constitutional requirements for an inventory search. Not only does Matthews mischaracterize the holdings of those courts, but those opinions are distinguishable. In *Salmon*, the law enforcement agency had "no written policy regarding inventory search procedures," much less one addressing closed containers. 944 F.2d at 1121. Likewise, in *Hahn*, the relevant agency had no written procedures for conducting an inventory search. 922 F.2d at 247.

[9]Although this issue has not been directly addressed by the Supreme Court, the Court in *Bertine*, reaffirming the principles set forth in *Lafayette*, 462 U.S. at 648, and *United States v. Ross*, 456 U.S. 798, 821 (1982), noted:

> Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police offi-

Second Circuit examined whether certain inventory search regulations provided standardized criteria as to the opening of closed containers. The regulations stated, in relevant part, "A member of the Department who impounds any motor vehicle shall inventory the contents of the vehicle and record the results. . . . It is not necessary to enter locked portions of any vehicle to conduct an inventory search when keys to enter are not available." 29 F.3d at 66. The court determined that the regulations need not "specifically mention the term 'closed containers'" to regulate the opening of such containers. *Id.* Instead, the court found that "[t]he terms 'contents' and 'locked portions' in the regulations provide sufficient elucidation to satisfy the constitutional requirements for an inventory search of a closed container when keys are available." *Id.*

Similarly, on two separate occasions, the Seventh Circuit has held that a police department's policy need not use the term "closed containers" to provide standardized criteria for the opening of such items. In *Wilson*, the defendant argued that the Illinois State Police did not have a policy regulating the opening of closed containers encountered during an inventory search. 938 F.2d at 789. The court disagreed, finding instead that "the Tow-In Policy's requirement to examine and inventory the contents of the vehicle, combined with the requirements in the Tow-In Report to 'List Personal Effects/Parts Obviously Missing/Other Damage' clearly establishes the policy that closed containers can be opened." *Id.* at 790. The court noted that "[w]hile the Illinois policy

---

cers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit.

When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between . . . glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

479 U.S. at 375 (internal quotation marks and citations omitted).

may not use the buzz words 'closed container' . . . the term 'contents' provides sufficient elucidation" to satisfy the constitutional requirements for an inventory search. *Id.* at 789.

The Seventh Circuit had occasion to review the same policy again in *Richardson*. In that case, the defendant argued that the police officer violated his Fourth Amendment rights when he opened his shaving bag during an inventory search of his car. 121 F.3d at 1054. The defendant insisted that the policy at issue allowed only for the opening of containers that were connected to, or part of, the car.[10] *Id.* at 1056. The court disagreed, finding that "the plain language of the policy does not prohibit the search of containers that can be removed from a car" and that "[s]earching unlocked containers found in the passenger compartment or the trunk of a car accomplishes the same purpose as searching the containers listed in the policy —it protects against claims of stolen or damaged personal property."[11] *Id.*

---

[10]That policy provides, in relevant part:

> An examination and inventory of the contents of all vehicles/boats towed or held by authority of department officers will be made by the officer who completes the Tow Report. This examination and inventory will be restricted to those areas where an owner or operator would ordinarily place or store property or equipment in the vehicle/boat, and would normally include front and rear seat areas, glove compartment, map case, sun visors, and trunk and engine compartments.

*Id.* at 1055.

[11]A similar conclusion was reached by the Fifth and Sixth Circuit courts in two unpublished opinions. *United States v. Foots*, No. 08-11057, 2009 WL 2486949, at *4 (5th Cir. Aug. 14, 2009) (determining that a policy that required "inventorying the subject's property entirely" in order to find and catalog everything also allowed for the opening of closed containers); *United States v. Hill*, No. 88-3825, 1990 WL 208767, at *3 (6th Cir. Dec. 18, 1990) (noting that "police department regulations [should not be required to] address specifically and separately the manner in which arresting officers must handle the inventory of the myriad closed containers that may be found in arrestees' automobiles").

Like the policies discussed in *Thompson*, *Wilson*, and *Richardson*, the Department's policy, though not explicitly using the phrase "closed containers," sufficiently regulates the opening of such containers to provide standardized criteria to justify Deputy Clark's search of Matthews's bags. That policy requires, in relevant part, for "[a] complete inventory [to] be taken on all impounded or confiscated vehicles including the interior, glove compartment and trunk." J.A. 28. Only by opening all closed containers could a police officer effectively comply with this requirement for a "complete inventory." In addition, that the policy expressly permits examination of glove boxes, which are closed containers, strongly suggests that a "complete inventory" requires the opening of closed containers.

The circumstances in this case represent the typical situation in which the necessity of an inventory search arises. As the policy in question reflects, the purpose of conducting the inventory search is to protect the owner's property while in the custody of the police from "loss or theft." J.A. 28. Only by performing a full inventory of the car—which includes opening closed containers—could an officer identify all the vehicle's valuables and effectively secure them. Accordingly, we agree with the district court that because the Department's policy authorizes the opening of closed containers encountered during an inventory search and Deputy Clark adhered to that policy, Deputy Clark's search falls within the inventory search exception and thus does not violate the Fourth Amendment.

### B.

Second, Matthews argues that Deputy Clark could not have followed standardized criteria that would justify a warrantless search because the Department's policy does not properly curtail the discretion of searching officers. Again, we disagree.

As noted above, a police department's policy must curtail a searching officer's discretion so as to prevent searches from

becoming "a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4. A policy must provide officers discretion only to the extent necessary to effectuate the purposes of an inventory search—namely, to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372. Otherwise, the policy might devolve into "'a purposeful and general means of discovering evidence of crime.'" *Wells*, 495 U.S. at 4 (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)). However, within the constraints of the policy, officers may exercise discretion in deciding whether or not to open a particular container. *Id.* This means that

> while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.

*Id.*

Here, by requiring that searching officers perform a "complete inventory" in order to "to prevent any loss or theft," the Department's policy gives officers the discretion to determine whether a valuable may be located within a container so as to require that container's opening. J.A. 28. But the Department's policy sufficiently limits that discretion in various ways. First, the policy requires officers to search particular areas—specifically, the interior, glove compartment and trunk. Second, it requires officers to lock in the trunk of the vehicle or otherwise secure all valuables located in the interior or glove compartment. Finally, the policy requires offi-

cers to complete an inventory form and file it in triplicate. These mandates make the discretion afforded to officers by the Department's policy clearly related to the purposes of an inventory search, namely, "to protect an owner's property while it is in the custody of the police, [and] to insure against claims of lost, stolen, or vandalized property." *Bertine*, 479 U.S. at 372. And a police officer should be allowed "sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Banks*, 482 F.3d at 739 (internal quotation marks and citations omitted). Accordingly, we find that because the Department's policy properly curtails the discretion of searching officers and Deputy Clark adhered to that policy, Deputy Clark's search falls within the inventory search exception and thus does not violate the Fourth Amendment.

## III.

For the reasons set forth above, we affirm Matthews's conviction and sentence.

*AFFIRMED*