**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 08-5129**

---

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

JONATHON TERRELL PATTERSON, a/k/a Joe-Joe,

                Defendant - Appellant.

---

**No. 09-4374**

---

UNITED STATES OF AMERICA,

                Plaintiff – Appellee,

      v.

THOMAS JOSEPH ISBELL,

                Defendant – Appellant.

---

Appeals from the United States District Court for the Western
District of North Carolina, at Statesville.   Richard L.
Voorhees, District Judge.  (5:06-cr-00022-RLV-CH-12; 5:06-cr-
00022-RLV-DSC-18)

---

Argued:  October 29, 2010         Decided:  January 4, 2011

---

Before WILKINSON, KING, and AGEE, Circuit Judges.

Affirmed in part; vacated and remanded in part by unpublished per curiam opinion.

———————————

**ARGUED:** Elizabeth A. Brandenburg, LAW OFFICE OF MARCIA G. SHEIN, PC, Decatur, Georgia, for Appellants.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Marcia G. Shein, LAW OFFICE OF MARCIA G. SHEIN, PC, Decatur, Georgia, for Appellants.  Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jonathon Patterson and Thomas Isbell appeal their convictions for conspiracy to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846. In addition to challenging the sufficiency of the evidence to establish a single conspiracy, Patterson and Isbell allege multiple errors at trial, and Patterson challenges the procedural reasonableness of his sentence.[1] For the reasons set forth below, we affirm Patterson and Isbell's convictions, but vacate Patterson's sentence and remand his case for resentencing.

I.

Patterson and Isbell (collectively "Defendants") were two of twenty-three individuals named in a thirty-count indictment alleging a multi-year conspiracy between dozens of indicted and unindicted co-conspirators to possess with the intent to distribute cocaine powder and cocaine base within the Western District of North Carolina.

The Defendants each pled not guilty, and the Government proceeded to try them jointly. The jury found both of them guilty. The district court then sentenced Patterson to 324

---

[1] Isbell does not raise any issues regarding his sentence.

months' imprisonment and Isbell to 262 months' imprisonment. Additional facts relating to each of the issues raised on appeal will be discussed in context. The Defendants noted timely appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

### A.

The Defendants first assert the evidence was insufficient to convict them of a single, organized conspiracy. They argue the evidence shows – at most – multiple conspiracies involving individuals who "[got] their drugs wherever they were available" rather than intentionally engaging in a common criminal scheme. (Appellants' Opening Br. 40.)

In assessing whether a guilty verdict is sufficiently supported by the evidence, we are mindful that "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (quotation marks omitted). The jury's verdict must be sustained as long as "any rational trier of fact could have found the essential elements of the [conspiracy charged in the indictment] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted). In conducting such a review, we

4

view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the Government. United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003).

To prove the existence of a conspiracy, the Government was required to show: (1) two or more persons agreed to possess an illegal substance with the intent to distribute it; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. Burgos, 94 F.3d at 857. Because conspiracies are by nature "clandestine and covert," there is "frequently . . . little direct evidence of such an agreement." Id. Circumstantial evidence can be used to prove the existence of a conspiracy, and it can be the only proof of the conspiracy. Id. at 857-58.

Under this Court's precedent, "trial evidence is sufficient to establish a single conspiracy where the conspirators are shown to share the same objectives, the same methods, the same geographic spread, and the same results." United States v. Smith, 451 F.3d 209, 218 (4th Cir. 2006). A member of a conspiracy may not know its full scope or partake in its full range of activities; moreover, the conspiracy need not "have a discrete, identifiable organizational structure." United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993). "[O]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the

5

conspiracy to support conviction." Burgos, 94 F.3d at 861 (quotation marks and citation omitted). "The term 'slight' does not describe the quantum of evidence that the Government must elicit in order to establish the conspiracy, but rather the connection that the defendant maintains with the conspiracy." Id.

The evidence of Patterson and Isbell's participation in the charged conspiracy was significant. Numerous co-conspirators testified that the Defendants regularly purchased cocaine and cocaine base from and sold it to the same network of individuals in and around the same localities in western North Carolina. They also testified that the Defendants referred buyers to other members of the conspiracy, transacted exchanges on behalf of other conspirators, as well as sometimes asking others to do the same for them.

In addition to the testimony of co-conspirators, the Government proved its case based on the testimony of law enforcement officers who had interacted with and investigated the Defendants. Both Patterson and Isbell had previously been found in possession of cocaine or cocaine base during searches of their vehicle or residence. In addition, telephone records connected numbers associated with the Defendants to each other and also to numbers associated with other members of the charged conspiracy. Lastly, expert testimony described the Defendants'

failure to file federal tax returns and that the failure to file regular returns was consistent with common practices among individuals who earned their living by distributing narcotics.

Our review of the evidence in the record as summarized above leads us to conclude that a rational trier of fact could have found the essential elements of the charged single conspiracy beyond a reasonable doubt. Accordingly, the evidence is sufficient to support the Defendants' convictions. Cf. Jackson, 443 U.S. at 319.

B.

Patterson and Isbell raise two challenges related to the district court's limitations on cross-examination of witnesses. First, they contend the district court abused its discretion by preventing them from cross-examining witnesses about the disposition of state charges that had been brought against them but which were ultimately dismissed. Second, they contend the district court abused its discretion by refusing to allow them to inquire about possible racial bias during the course of the investigation into the drug conspiracy. They assert that in each instance, the district court violated their constitutional right to confront the witnesses against them.

7

1.

As part of its case against Patterson, the Government called a former Lenoir Police Department officer to testify about a March 1998 traffic stop during which he discovered crack cocaine in Patterson's possession. On cross-examination, Patterson attempted to introduce evidence that state charges brought as a result of this incident had been dismissed. The district court sustained the Government's objection.

The Government later called a state bureau of investigation agent who, in describing the sort of evidence relevant to his investigation into the charged conspiracy, referred to his discovering the fact that drugs were seized during an October 2000 search of Isbell's residence. On cross-examination, Isbell attempted to elicit testimony that the state charges brought against him as a result of the 2000 search were ultimately dismissed. The district court once again disagreed, stating that such questioning would

> invite a mini trial on what happened and why . . . [i]t would be more likely to invite confusion or misunderstanding by the jury to go into the fact that the state for whatever reason didn't pursue [the charges]. And you know well yourself that there are zillions of reasons why cases get dismissed and none of them . . . concern this jury.

(J.A. 1770-71.)

Throughout both of these exchanges, the Defendants raised evidentiary arguments as to why they should be permitted to

introduce evidence that the state charges were dismissed.  At no time did they refer to their constitutional right to confront the witnesses against them.  Because the Defendants raise a Confrontation Clause argument for the first time on appeal, we review it for plain error.  See United States v. Hughes, 401 F.3d 540, 547 (4th Cir. 2005) (reviewing for plain error an issue the party failed to raise below); see also United States v. Gibbs, 739 F.2d 838, 846-50 & n.25 (3d Cir. 1984) (reviewing for plain error a Confrontation Clause argument raised for the first time on appeal even where the defendant raised an admissibility argument below because separate rules govern each issue, and preserving the latter does not preserve the former).  Under plain error review, the Defendants must show: (1) there is an error; (2) the error is plain; (3) the error affects their substantial rights; and (4) failure to correct the error "would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  Hughes, 401 F.3d at 547, 548, 555 (quotation marks and citations omitted).

The Confrontation Clause of the Sixth Amendment guarantees criminal defendants the opportunity for effective cross-examination.  See Davis v. Alaska, 415 U.S. 308, 315-16 (1974). It does not, however, confer the right to cross-examine "in

9

whatever way, and to whatever extent, the defense might wish." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)). District courts thus "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  Id.

Having reviewed the record, we find no error – let alone plain error – in the district court's refusal to allow the Defendants to cross-examine the witnesses on this issue. Evidence that state charges against Patterson and Isbell were dismissed was simply not relevant to the issue before the jury: whether Patterson and Isbell conspired to distribute narcotics, in violation of federal law.  Moreover, as the district court observed, the reason why the state charges were dismissed could be entirely unrelated to whether the Defendants committed the acts described.  The admission of such evidence would have been only marginally relevant and confused the issues before the

10

jury.  As such, the district court's ruling did not plainly violate the Defendants' Confrontation Clause rights.[2]

2.

The same principles guide our review of the other Confrontation Clause-based issue the Defendants raise, the district court's refusal to allow them to inquire into possible racial bias in the investigation.  During their cross-examination of an agent who investigated the conspiracy, the Defendants sought to elicit testimony about the race of the individuals investigated and indicted for their participation in the conspiracy.  The district court prohibited the Defendants

---

[2] The Defendants do not raise a separate evidentiary-based argument on appeal, but to the extent such an argument overlaps with the Confrontation Clause argument, it also fails.  Although this Court has not previously examined this issue directly, every other circuit that has done so has uniformly upheld the district court's exercise of discretion to exclude evidence of the disposition of a prior criminal proceeding.  E.g., United States v. Lyons, 403 F.3d 1248, 1255-56 (11th Cir. 2005); United States v. Smith, 145 F.3d 458, 462-63 (1st Cir. 1998); United States v. Tirrell, 120 F.3d 670, 677-78 (7th Cir. 1997); United States v. Riley, 684 F.2d 542, 546 (8th Cir. 1982); United States v. Kerley, 643 F.2d 299, 300-01 (5th Cir. 1981).  As discussed previously, such evidence had minimal to no probative value, and was likely to confuse or mislead the jury.  Thus, under Federal Rules of Evidence 401 and 403, the district court did not abuse its discretion in prohibiting the Defendants from introducing evidence on this point.  See United States v. Moore, 27 F.3d 969, 974 (4th Cir. 1994) (reviewing for abuse of discretion a district court's ruling on the admissibility of evidence under the Federal Rules of Evidence).

11

from pursuing this line of questioning because it would lead to a "rabbit trail [of] immaterial[ity]" as to whether Patterson and Isbell participated in the conspiracy. (J.A. 1780.)

Once again, the Defendants' arguments at trial focused on the admissibility of this evidence rather than whether their Confrontation Clause rights were being violated. Accordingly, we review their argument for plain error. Cf. Hughes, 401 F.3d at 547. We conclude the district court did not plainly err in prohibiting the Defendants from cross-examining the agent about possible racial bias in the investigation. Nothing the Defendants sought to present at trial tended to show that any investigator acted with racial bias. While they sought to introduce evidence of the race of individuals indicted for the conspiracy, they offered no evidence connecting that information to any evidence suggesting that either the investigation or the decision of whom to indict was racially motivated. Consequently, this line of inquiry would unnecessarily have led the jury astray from the issue before them, whether Patterson and Isbell were members of the charged conspiracy. As such, the district court's decision to prohibit such questioning did not constitute error.

12

Patterson and Isbell next claim they were denied a fair trial due to the district court's decision not to exclude the testimony of witnesses who had violated the court's sequestration order.[3] During the trial, a witness testified that he and several other witnesses had been locked up together at the courthouse for several days as they waited to testify. The witness claimed that during that time, another witness told the others questions he had been asked such as "questions about your school history[,] . . . did you use drugs or anything of that nature." (J.A. 1330-31.) The witness claimed that they had not talked about the answers to any of the questions or conferred to get their stories straight. The Defendants requested a mistrial, or in the alternative that the witnesses' testimony be stricken, or for a limiting instruction.

Noting the availability of several remedies in cases where a sequestration order is violated, the district court concluded "there has been significant cross examination of all the witnesses subsequent to the very first day of trial . . . [and] [g]oing forward . . . counsel is encouraged to undertake what

---

[3] Prior to trial, the district court issued a sequestration order prohibiting "any person who will be or may become a witness in this case (except those excluded by Rule 615)" from, inter alia, "talk[ing] with anyone who will be or may become a witness about any subject related to this trial." (J.A. 214.)

it's been doing all along and that is cross examining on the potential cross fertilization of testimony that may have occurred." (J.A. 1338.) The court denied the motion for a mistrial, but did instruct the jury about the violation of the sequestration order.[4]

On appeal, the Defendants claim that the limiting instruction was insufficient to cure the breach of the violation of the sequestration order. This is so, they contend, because the Government's case against them consisted almost entirely of the testimony of co-conspirators, and the violation of the sequestration order significantly undermined the credibility of

---

[4] The instruction given stated:

> You've heard testimony that several government witnesses are housed together either at the county – a county jail or in this courthouse. You've heard testimony earlier today from government witness . . . Corpening that while in the holding cell of this courthouse, he heard a prior witness or witnesses who had already testified describe certain questions that had been posed in this trial. You may consider this information and like information as you determine the credibility of the testimony that you have heard. In other words, if you find any witness may have been exposed to conversations about this case or that any witness may have participated in such conversation, you should receive the testimony of such a witness with great caution and you may give it such weight, if any, as you deem appropriate in the light of these alleged conversations or other similar evidence.

(J.A. 1407.)

14

that testimony, which in turn undermines confidence in the jury's verdict.

This Court reviews the district court's selection of a remedy for the violation of a sequestration order for abuse of discretion. See United States v. Leggett, 326 F.2d 613, 613-14 (4th Cir. 1964) (per curiam) (stating the court's choice of remedy "depends upon the particular circumstances and lies within the sound discretion of the trial court").

In United States v. Cropp, 127 F.3d 354 (4th Cir. 1997), the Court observed that the Supreme Court has identified three remedies that are appropriate when a sequestration order has been violated: (1) sanctioning the witness; (2) instructing the jury that it may consider the violation with regard to the issue of credibility; or (3) excluding the witness' testimony. Id. at 363. "The remedy of exclusion is so severe that it is generally employed only when there has been a showing that a party or a party's counsel caused the violation." Id.

Here, the district court, after reviewing the available options and the nature of the violation in this case, chose the second remedy of issuing a jury instruction. In so doing, it did not abuse its discretion. There is no suggestion in this case that the Government caused the violation of the sequestration order. In addition to giving a limiting instruction, the district court also permitted Patterson and

15

Isbell to extensively cross-examine witnesses about the sequestration order violation as well as other occasions where the witnesses were housed together and able to communicate with one another prior to trial. The jury thus considered – and rejected – the Defendants' contention that the witnesses' testimony was unreliable or incredible due to opportunities where the witnesses communicated with one another. Accordingly, we conclude the district court did not abuse its discretion in deciding to issue a limiting instruction rather than excluding the witnesses' testimony.

D.

Isbell challenges the district court's denial of his pretrial motion to suppress evidence seized during an October 2000 search of his residence. Specifically, Isbell asserts that the basis for the warrant – an affidavit signed by Caldwell County Sheriff's Department Detective J.K. Coleman – did not allege facts sufficient to support a probable cause finding. Accordingly, Isbell contends that the subsequent search violated his Fourth Amendment rights, and required suppression of all evidence obtained during the search.

The Fourth Amendment guarantees "the right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures." The Supreme Court adopted the

16

prophylactic exclusionary rule to deter future police conduct that violates the Fourth Amendment. As such, evidence obtained in violation of the Fourth Amendment – e.g., based on a search warrant that is not supported by probable cause – cannot be used in a criminal proceeding against the victim of the illegal search and seizure. United States v. Calandra, 414 U.S. 338, 347 (1974).[5]

This Court reviews the legal conclusions underpinning a denial of a motion to suppress de novo and we review the district court's factual findings for clear error. United States v. Richardson, 607 F.3d 357, 369 (4th Cir. 2010). An appellate court's duty is "to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. (quotation marks omitted). "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996) (citing United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990)). But the Court reviews that evidence in the light

---

[5] In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court established a good-faith exception to this rule, which permits, under certain circumstances, the use of evidence obtained through a subsequently-invalidated search warrant. In this case, we decline to exercise our discretion to proceed directly to considering whether the Leon exception applies. See United States v. DeQuasie, 373 F.3d 509, 520 (4th Cir. 2004).

17

most favorable to the Government. United States v. Matthews, 591 F.3d 230, 234 (4th Cir. 2009).

Whether probable cause exists is a case-by-case inquiry that depends on the totality of the circumstances. United States v. DeQuasie, 373 F.3d 509, 518 (4th Cir. 2004). The judge reviewing the application for a search warrant must "simply . . . make a practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also Ornelas v. United States, 517 U.S. 690, 696 (1996). Thus, the known facts and circumstances of a case at the time a warrant is sought will not – and need not – be an airtight case against the defendant. Instead, the concern is whether a reasonable person would conclude the "fair probability" that such evidence exists. See Gates, 462 U.S. at 238.

Here, the magistrate judge based the probable cause determination on an affidavit provided by Detective Coleman. That affidavit provides the following information: Within 96 hours of the affidavit being signed, Detective Coleman had spoken with a "confidential and reliable source of information" ("CI") who had on at least four prior occasions provided information that resulted in the seizure of controlled

18

substances and arrests of suspects. (J.A. 182.) The CI told Coleman that Isbell sold "quantities of alleged crack cocaine" to the CI "in the past." (J.A. 182.) Based on this information, Detective Coleman arranged for the CI to make a controlled purchase of crack cocaine from Isbell at his residence on Prospect Street. The CI was equipped with wireless transmitters that were monitored but not recorded; in addition, prior to the purchase, the CI and her vehicle were searched for contraband. Law enforcement officers monitored – both visually and via the CI's wire – the transaction where the CI purchased "a quantity of off-white rock-like substance," which Isbell represented to be crack cocaine. (J.A. 183.) After making the purchase, the CI traveled directly to an arranged spot and delivered the substance to law enforcement officers. In addition, the affidavit stated that Coleman's investigation of Isbell revealed that in October 1999, two anonymous telephone callers reported that Isbell was selling drugs from his parents' home. Based on the totality of these facts, as well as his experience and education,[6] Detective Coleman believed there was

---

[6] Detective Coleman averred that he had received over 1,000 hours of law enforcement training, had completed over 90 semester hours towards a bachelor's degree majoring in criminal justice, and had been involved in numerous narcotics investigations. He further stated that he had worked closely with agencies at every level of government concerning drug trafficking in North Carolina and was familiar with distribution
(Continued)

probable cause to authorize a search for controlled substances at Isbell's residence on Prospect Street.

Isbell characterizes the affidavit as "bare bones," failing to provide sufficient detail of timely events occurring at Isbell's Prospect Street residence to support a probable cause determination. Much of Isbell's argument focuses on the inadequacy of specific components of the affidavit and ignores the Supreme Court's directive that a probable cause determination is made based on the "totality of the circumstances." See Gates, 462 U.S. at 238-39 (adopting a "totality of the circumstances" test in evaluating probable cause rather than requiring independent scrutiny of each piece of evidence cited in an affidavit). Thus, information that may not be independently sufficient can, when combined with other factors, support the court's overall analysis.

Isbell also contends the CI's statements about past purchases of narcotics from Isbell were insufficiently detailed or reliable to form the basis of probable cause. This argument, too, lacks merit. "[P]robable cause may be founded upon hearsay and information received from informants." DeQuasie, 373 F.3d at 518. As a general principle, it is not necessary for all

---

methods of drug trafficking within the state, and specifically within Caldwell County.

tips to be corroborated in order to be considered credible, and whether corroboration is necessary in a given case depends on the particular circumstances of that case. Id. at 518-19. Here, the CI was not an anonymous source, but someone known to Detective Coleman who had previously provided reliable information that assisted in arrests on four prior occasions. Nor were the CI's statements simply generalized comments casting suspicion on Isbell; they were comments admitting to participating in the alleged illegal conduct – the CI claimed to have personally purchased cocaine from Isbell.[7] "The Supreme Court has repeatedly recognized that a proven, reliable informant is entitled to far more credence than an unknown, anonymous tipster." See United States v. Bynum, 293 F.3d 192, 197 (4th Cir. 2002).

Detective Coleman's affidavit also contained detailed information about the CI's controlled purchase of cocaine from Isbell at his Prospect Street resident within 96 hours of signing the affidavit. The controlled purchase not only

---

[7] These circumstances sharply distinguish this case from the "bare bones" affidavit in United States v. Wilhelm, 80 F.3d 116, 121 (4th Cir. 1996), which the Court concluded could not support a probable cause finding. The affidavit in Wilhelm was based on a single telephone call from an anonymous "concerned citizen" who the affiant swore, without any basis for doing so, was "a mature person with personal connections with the suspects and [who] has projected a truthfull [sic] demeanor . . . ." Id. at 117-18, 121.

corroborated the CI's statements regarding her past purchases, but also provided independent grounds on which to base the finding of probable cause. See United States v. Clyburn, 24 F.3d 613, 618 (4th Cir. 1994) (holding the controlled purchase of crack cocaine at the suspect's residence verified an informant's reliability as to prior purchases and also constituted probable cause for issuance of a search warrant).

Relying on United States v. Wagner, 989 F.2d 69 (2d Cir. 1993), Isbell asserts that the controlled purchase was too remote in time from the issuance of the warrant to support a finding of probable cause. This Court has repeatedly said "the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." United States v. Farmer, 370 F.3d 435, 439 (4th Cir. 2004) (quotation omitted). "Rather, [the Court] must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." Id. (quotation omitted). Furthermore, the period of 96 hours at issue here is a much shorter time frame than the six weeks that lapsed between the drug purchase and acquisition of a search warrant in Wagner. Cf. Wagner, 989 F.2d at 74-75.

For these reasons, the totality of the circumstances set forth in Detective Coleman's affidavit supports the magistrate judge's finding of probable cause to issue the search warrant of Isbell's residence. The district court thus did not err in denying Isbell's motion to suppress the evidence uncovered during the subsequent search.

## E.

Lastly, Patterson challenges two components of the procedural reasonableness of his sentence: whether the district court erred in applying a two-level offense level enhancement for possession of a firearm and whether the district court erred in failing to adequately articulate the basis for its sentence.[8]

## 1.

Over Patterson's objection, the district court applied a two-level enhancement to his offense level pursuant to U.S.S.G. § 2D1.1(b)(1). This section requires the district court to increase a defendant's offense level two levels "[i]f a dangerous weapon (including a firearm) was possessed" during a drug offense. U.S.S.G. § 2D1.1(b)(1). The evidence adduced at

---

[8] As noted above, Isbell does not raise any issues on appeal related to his sentence.

trial shows that at least three witnesses testified that Patterson possessed a firearm as part of the conspiracy to distribute drugs. Carlos Gibbs, a co-conspirator, testified that Patterson had a firearm in his vehicle during drug transactions. Former Lenoir Police Department Officer Michael Rawls testified that Patterson was carrying a firearm during a 1998 traffic stop during which narcotics were seized from Patterson's vehicle.[9] And Samuel Davis, another co-conspirator, testified that he gave Patterson a gun in 1995 because Patterson "was in some trouble, [and] needed one" for protection during a conflict Patterson had with some other drug dealers. (J.A. 1584-85.)

Based on this evidence, the district court did not clearly err in applying the enhancement to Patterson's offense level calculation. United States v. Layton, 564 F.3d 330, 334 (4th Cir. 2009) (stating that an appellate court reviews the district court's legal conclusions de novo and its factual findings for clear error); United States v. Harvey, 532 F.3d 326, 336-37 (4th Cir. 2008) (stating that a court will reverse for clear error

---

[9] Although Rawls mistakenly misidentified Isbell, rather than Patterson, as the individual involved in the 1998 traffic stop, Patterson did not object to this misidentification. Moreover, Rawls' testimony and the accompanying paperwork surrounding the arrest clearly identified Patterson as the individual in possession of both a firearm and narcotics.

24

only if it is "left with the definite and firm conviction that a mistake has been committed") (internal quotation marks omitted).

2.

After calculating Patterson's advisory Guidelines range and hearing the parties' arguments as to an appropriate sentence, the district court stated: "Pursuant to the Sentencing Reform Act of 1984, U.S. against Booker, and [18 U.S.C. § 3553(a),] [Patterson] will be committed to custody for a period of 324 months. That being the low end of the guidelines." (J.A. 2430.) Patterson contends that this explanation fails to adequately explain the basis for the sentence imposed, based on this Court's precedent. The Government, noting that Patterson's sentencing hearing took place prior to this Court's decisions in United States v. Carter, 564 F.3d 325 (4th Cir. 2009), and United States v. Lynn, 592 F.3d 572 (4th Cir. 2010), concedes that the court's explanation was inadequate and that the sentence should be vacated and the matter remanded for resentencing.

We agree. Although Patterson's sentence was at the low end of the Guidelines range, the district court failed to provide any explanation in support of the sentence it ultimately imposed. As such, it did not allow for meaningful adequate review of the sentence, as set out in Carter. 564 F.3d at 328

25

("When rendering a sentence, the district court must make an <u>individualized</u> assessment based on the facts presented [and] state in open court the particular reasons supporting its chosen sentence." (internal quotation marks and citations omitted)). We cannot say that this error was harmless. <u>Lynn</u>, 592 F.3d at 585 (finding reversible error where the district court's brief comments did not show that it had "considered the defendant's nonfrivolous arguments prior to sentencing him" and the Government could not show that the district court's "explicit consideration of those arguments would not have affected the sentence imposed" (internal quotation marks omitted)). Accordingly, we vacate Patterson's sentence and remand for resentencing.

## III.

For the aforementioned reasons, we affirm the district court's judgments of conviction as to both Patterson and Isbell. However, we vacate Patterson's sentence and remand for resentencing.

<u>AFFIRMED IN PART;</u>
<u>VACATED AND REMANDED IN PART</u>